1

2

3

4                          UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    DRUMMOND COMPANY, INC.,                    Case No.  13-mc-80169-JST   (JCS)

8                      Plaintiff,               Case No.  13-mc-80171-JST   (JCS)

9           v.                                  **ORDER GRANTING IN PART AND
                                                DENYING IN PART MOTIONS TO**
10   TERRENCE P. COLLINGSWORTH, et              **QUASH**
     al.,
11                                              **Dkt. Nos. 1**
                     Defendants.

12
     This order applies to two related cases:
13
     Case No. 13-mc-80169-JST (JCS)
14   Case No. 13-mc-80171-JST (JCS)

15

16   **I.      INTRODUCTION**

17          This discovery dispute arises out of a libel action filed by Drummond Company, Inc.

18   (hereafter, "Drummond") in the Northern District of Alabama against Terrence Collingsworth,

19   Esq. and his law firm, Conrad & Scherer, LLP (hereafter, "Defendants").  *See Drummond Co.,*

20   *Inc. v. Terrence P. Collingsworth, et al.*, No. 11-cv-3695-RDP (N.D. Ala.).  Drummond has

21   served subpoenas on nonparty internet service providers Google and Yahoo!, seeking subscriber

22   and usage information associated with four email addresses.  Defendants and Lorraine M. Leete,

23   one of the holders of the email addresses, filed separate but substantively identical Motions to

24   Quash (hereafter, the "Motions"), contending that information sought by the subpoenas constitutes

25   work product, is protected under the First Amendment, is overbroad, is duplicative of discovery

26   already produced in related actions between the parties, and poses a security risk to certain

27   individuals affected by the subpoenas.  United States District Court Judge John S. Tigar referred

28   both Motions to this Court.  A hearing on the Motions was held on November 15, 2013.  For the

reasons stated below, the Motions are GRANTED in part and DENIED in part.

## II.     BACKGROUND

### A.     The Libel Suit

United States District Court Judge R. David Proctor of the Northern District of Alabama presides over the underlying libel action.  Drummond alleges that three letters written by Collingsworth to Dutch officials and a Japanese CEO contain defamatory statements regarding Drummond's human rights record. Declaration of H. Thomas Wells, III in Support of Plaintiff Drummond Company, Inc.'s Opposition to Motion to Quash ("Wells Decl.") Exs. 7-A, 7-B & 7-C (Letters).  In the letters, Collingsworth accuses Drummond of committing severe human rights abuses.  In particular, Collingsworth writes that Drummond had ongoing connections with a Colombian paramilitary group, the Autodefense Unidas de Colombia ("AUC"), and hired AUC members to assassinate Drummond union leaders.  *See id.*  Drummond denies all such allegations, and alleges that Collingsworth maliciously wrote these letters while knowing the information was false and/or acting in reckless disregard to the truth.

### B.     Prior Litigation & Witness Payments

Prior to Drummond's filing of the libel action, Collingsworth had been lead counsel for plaintiffs in several lawsuits accusing Drummond of human rights abuses in Colombia in violation of the Alien Tort Statute and Torture Victims Protection Act, 28 U.S.C. § 1350.  *See, e.g.*, *Balcero, et al. v. Drummond Co., Inc.*, No. 09-cv-1041-RDP (N.D. Ala.) ("*Balcero*"); *see also* Declaration of Terrence Collingsworth in Support of Defendants' Motion to Quash Subpoenas ("Collingsworth Decl.") ¶ 1-2.  Judge Proctor also presided over the *Balcero* case.  During most of the time Collingsworth engaged in litigation against Drummond, Collingsworth has been a partner at Conrad & Scherer LLP, as well as the Executive Director and General Counsel for International Rights Advocates, a nonprofit that shares an office with Conrad & Scherer LLP in Washington D.C.  Collingsworth Decl. ¶¶ 1-2.

Drummond states that after the discovery deadline in *Balcero*, counsel for plaintiffs (i.e. Defendants in this case) produced on August 16, 2012 and January 4, 2013 documents reflecting payments to certain witnesses.  Wells Decl., Ex. 7 (July 1, 2013 Declaration of H. Thomas Wells,

United States District Court
Northern District of California

2

III) ¶ 3.  Drummond contends that there is evidence Defendants paid over $90,000 to witnesses in Colombia who have offered testimony against Drummond.  Defendants do not dispute that they made payments, but claim that payments were necessary for the security of the witnesses testifying to Drummond's human rights abuses because they were at risk of retaliation.  Drummond claims the payments were improper, and contends that the subpoenas issued to Google and Yahoo! are directly targeted at the email accounts that were used to discuss improper payments.

**C.      The Subpoenas**

The subpoena issued to Google requests identity and usage information relating to lorrainemleete@gmail.com and libardoduart@gmail.com.  The subpoena issued to Yahoo! requests identity and usage information relating to halcon85@yahoo.com and jojopidi@yahoo.com.  Both subpoenas request the following documents with respect to these email addresses from 2003 to the present:

> All DOCUMENTS RELATED TO (a) the identity of the user of the following email addresses, including but not limited to DOCUMENTS that provide all names, mailing addresses, phone numbers, billing information, date of account creation, account information and all other identifying information associated with the email address under any and all names, aliases, identities or designations RELATED TO the email addresses; and (b) the usage of the following email addresses, including but not limited to DOCUMENTS that provide IP logs, IP address information at time of registration and subsequent usage, computer usage logs, or other means of recording information concerning the email or Internet usage of the email address.

Collingsworth Decl., Exs. 1-2 (Drummond Company, Inc.'s Notice[s] of Intent to Serve Subpoenas on Non-Parties).  Drummond explains in its opposition brief that the subpoenas do not seek any information regarding the actual content of the emails sent from, or received by, these email addresses.

Defendants state that subpart (b) of the subpoenas relating to IP address and log information will reveal "the dates and times of log-ins, session durations, the physical location of witnesses and organizations, and possibly information about other services used by the account

3

holder." Motion at 3. While Defendants do not submit any evidence supporting this contention, the scope of information available through a subpoena relating to IP address and log information was discussed at length in *Chevron Corp. v. Donzinger*:

> An Internet Protocol address (or "IP address") is a numeric value used to identify the network location of a computer or set of computers on the Internet. Every computer on the Internet needs to have an IP address in order to communicate with other computers on the internet. IP addresses are allocated to Internet Service Providers (ISPs) in blocks of consecutive addresses out of a worldwide pool…. ISPs can further delegate these addresses to smaller entities such as businesses, Internet cafes, or smaller ISPs. ISPs can also assign an IP address directly to an individual computer. Individual users connect to the Internet using different IP addresses depending on where they are. An IP address may identify the network through which a network-enabled device (such as a desktop computer, laptop computer, tablet, or smartphone) is accessing the Internet. When a portable device moves from an Internet connection on one network (the network connection at one's home, for example) to an Internet connection on another network (a local coffee shop), the IP address associated with the portable device changes to reflect that the device is connected to that particular network.

> Many host computers of websites, including popular web-based email services[,] … maintain logs that list the IP address of visitors along with the date and time information. Websites that utilize a log-in feature typically maintain a log of IP addresses and other data associated with the particular user who logged in, such as the date and time of log-in and the duration of time the user visited the website.

> Through online services, a user can input a numerical IP address and obtain the registry's information about the assignee of that IP address, which might be an ISP or other entity. When IP addresses have been allocated directly to an organization that makes use of them[,] the online services can sometimes associate an IP address with an exact physical location…. On most occasions, however, the service will only associate an IP address with an Internet service provider's office, which is often in the same region as its subscribers or users but does not reveal their exact locations. These online services and other sources provide supplementary information about the geographic location where ISP's operate and where they use particular ranges of IP addresses…. For instance, the IP address 199.83.220.233 is easily traceable to San Francisco…. Where specific information about the physical location of an IP address is lacking, a litigant who possesses a list of IP addresses can subpoena

subscriber information from the corresponding ISP's for the specific
IP addresses and develop a detailed picture of a person's location
and movements from that subscriber information.

*Chevron Corp. v. Donzinger*, No. 12-mc-65 LAK/CFH, 2013 WL 3228753, at *2 (N.D.N.Y. June

25, 2013) (citing Declaration of Seth Schone, a Senior Staff Technologist with the Electronic

Frontier Foundation in San Francisco) (quotations and alterations omitted); *see also Chevron*

*Corp. v. Donziger*, 12-mc-80237 CRB (NC), 2013 WL 4536808, at *2 (N.D. Cal. Aug. 22, 2013)

(also citing a declaration of Seth Schone).

### D.  Lorraine Leete

Lorraine M. Leete states that she is the holder of the lorrainemleete@gmail.com account.

Declaration of Lorraine M. Leete in Support of Defendants' Motion to Quash Subpoenas ("Leete

Decl.") ¶ 1.  Leete is a United States citizen and lawyer licensed by the State Bar of New York.

*Id*. ¶ 1.  Since September of 2010, Leete has worked as a contract attorney for International Rights

Advocates as a member of Mr. Collingsworth's litigation team.  *Id*. ¶ 5.  She is based in Colombia.

*Id*. ¶ 7.  Leete states that on July 26, 2013, Google notified her about the subpoena, and indicated

that it would comply with the subpoena if Leete did not file a timely Motion to Quash.  *Id*. ¶ 3.

Leete asserts that she has used the lorrainemleete@gmail.com email account for personal

correspondence, as well as to engage in privileged, confidential communication related to the

*Balcero* litigation.  *Id*. ¶ 4.  Leete believes that her identity is obvious from the email address, and

that Drummond's subpoena is an attempt to intimidate her and not to discover her identity.  *Id*. ¶ 6.

Leete also states that she regularly checks her email accounts when she travels for work as well as

on her time off.  *Id*. ¶ 7.  She worries that the disclosure of her IP logs will produce a virtual

itinerary of her whereabouts—including the physical buildings from which she has worked and the

organizations with whom she has worked.  *Id*.

Leete states that she has been based in Colombia for the last three years, where human

rights defenders and union leaders face persecution and assassination for their organizing efforts.

*Id*.  On several occasions, Leete has met with threatened Colombia union leaders and human rights

defenders, and often logged into her email account during those meetings.  *Id*.  Thus, Leete

believes that disclosure of her IP logs could also disclose the location of threatened union leaders

United States District Court
Northern District of California

1   and human rights defenders, which unnecessarily subjects them to danger. *Id.* Since receiving

2   notice of the subpoenas, Leete has altered her use of her email accounts. She no longer logs in to

3   her email during meetings with threatened individuals in Colombia, as that would risk revealing

4   their exact geographic location, as well as the fact that they had met with her, which puts them at

5   greater risk for retaliation. *Id.*

6       Drummond has also attempted to serve a separate subpoena on Leete, but has been unable

7   to effect service. Wells Decl. ¶ 3 and Ex. 6. Drummond offered to withdraw the subpoena to

8   Google with respect to Leete if Leete will accept service of this subpoena commanding the

9   production of documents on her behalf. Wells Decl. ¶ 3. Drummond's counsel asked Defendants'

10   counsel if he would accept service of the subpoena on behalf of Leete; Defendants' counsel

11   responded that he did not have such authority. Wells Decl. Ex. 6.

12       **E.**    **Libardo Duarte**

13       Defendants assert that the libardoduart@gmail.com account is held by Libardo Duarte, a

14   Colombian national who provided deposition testimony and submitted sworn declarations in

15   support of the plaintiffs in the *Balcero* case. *See Balcero*, Dkt. No. 407-31 (Deposition of Libardo

16   Duarte). Duarte is an ex-member of the AUC and is currently incarcerated in Colombia for the

17   crimes he committed while he was a Commander of the AUC. Collingsworth Decl. Ex. 3

18   (February 27, 2011 Declaration of Libardo Duarte submitted in *Balcero*) ¶¶ 2, 4.

19       In a declaration submitted in support of the *Balcero* plaintiffs, Duarte explains that

20   Drummond operated a coal mine in Cesar, Colombia. *Id.* ¶ 7. In late 1998 or early 1999, Duarte

21   was sent by the AUC to join other AUC members working for Drummond. *Id.* ¶ 8. Duarte writes

22   that he learned from his AUC superior that Drummond paid the AUC about $500,000 per month.

23   *Id.* ¶ 30. He further writes that Drummond required other businesses to contract with the AUC as

24   a condition to contracting with Drummond, thus providing a further income source for the AUC.

25   *Id.* ¶ 31.

26       Duarte's main job was to patrol the roads of the area to make sure that trucks carrying

27   Drummond's coal were safe. *Id.* ¶ 8. Duarte writes that another AUC member, Jhon, was "in

28   charge of forcing people to sell their land where Drummond's railroad would be built." *Id.*

Duarte writes that "John displaced, disappeared, and killed the property owners who did not want to sell or who did not agree with the amount Drummond offered for the land, so that Drummond's railway could pass through this area." *Id*. In 2001, after Drummond union leaders were killed, Duarte was ordered to investigate, as the killing had not been cleared by the head of the AUC. *Id*. ¶ 36. Duarte states that he spoke with many people, including another AUC Commander who told Duarte that Drummond had paid him to assassinate the union leaders. *Id*.

In January of 2011, Duarte gave an interview to a journalist while in prison, and for the first time, spoke publically that he, as an AUC Commander, collaborated with Drummond. *Id*. ¶ 3. Duarte writes that immediately after an excerpt of this interview aired on the radio, he was attacked in prison by another prisoner with a knife. *Id*. Duarte escaped uninjured, and was subsequently transferred to a high security wing of the Picota prison. *Id*. Duarte executed the declaration establishing the foregoing facts on February 27, 2011.

In another declaration, Duarte writes that his family began to receive threats in the first few weeks of March of 2011, after Duarte had executed the first declaration on February 27, 2011. Collingsworth Decl., Ex. 3 (April 6, 2011 Declaration of Libardo Duarte) ¶ 5. Specifically, Duarte's domestic partner and two youngest children were approached by two men in a black truck when walking to school. *Id*. ¶ 6. One of the men exited the truck holding a photo of Duarte's domestic partner that looked like a photo that she had to provide when she entered the prison to visit Duarte. *Id*. The man told Duarte's domestic partner to tell "Paisa" to stop talking to the gringos, or they would pay for "Paisa" did. *Id*. ¶ 6. "Paisa" is one of Duarte's aliases. *Id*. ¶ 5. Duarte states that the only "gringos"–or people from the United States–that he has talked to in the last several years are the lawyers involved in the *Balcero* case. *Id*. ¶ 12.

Duarte also writes that four days after this incident, three shots were fired into his house in Antioquia at 11:00 p.m. when his family was sleeping. *Id*. ¶ 7. His family left the house immediately to stay with an aunt of Duarte's domestic partner who lived in the same town. *Id*. ¶ 8. The next morning, they left for the house of Duarte's domestic partner's brother, who also lives in Antioquia. *Id*. Several days later, Duarte's domestic partner was in a store when she saw a black truck driving by slowly down the street which looked like the black truck that had

United States District Court
Northern District of California

1    previously stopped her and her children.  *Id.* ¶ 9.  She worried that she was being followed, so she

2    and the children left Antioquia to go to a farm owned by Duarte's friend located far from

3    Medellin.  *Id.* ¶ 10.  By April 6, 2011, the day Duarte executed the declaration, his family had

4    stayed on the farm for one week.  *Id.*  Duarte wrote that his family could not stay at the farm

5    permanently.  *Id.*

6            Emails produced by Defendants to Drummond during the *Balcero* litigation show that

7    Defendants made two wire transfers to individuals named by Duarte.  On Friday, April 15, 2011,

8    Duarte wrote an email to Leete and provided the name of two women: Katerin Durango Avendaño

9    and Leydi Johana Perez Valencia.  Wells Decl., Ex. 7-AA.  The following Monday, April 18,

10   2011, a wire transfer was made from the account of Conrad & Scherer in the amount of $2,500 to

11   Leydi Johana Perez Valencia, one of the women named by Duarte.  Wells Decl., Ex. 7-BB.  On

12   April 29, 2011, another wire transfer was made from the account of Conrad & Scherer in the

13   amount of $2,500 to Katerin Durango Avendaño, the other woman named by Duarte.  Wells Decl.,

14   Ex. 7-DD.

15           When Conrad & Scherer notified these women of the transfers via email, it also sent them

16   a "support letter" to present to the bank.  The support letter sent to Ms. Perez Valencia reads, in

17   relevant part: "These funds were sent to Mrs. Perez Valencia with the purpose of providing

18   security to her family."  Decl., Ex. 7-BB.  The support letter sent to Ms. Durango Avendaño reads,

19   in relevant part: "These funds were sent to Mrs. Durango Avendano with the purpose of providing

20   security to her family."  Wells Decl., Ex. 7-DD.

21           It appears that the first transfer to Ms. Perez Valencia was delayed.  On Wednesday, April

22   20, 2011, Duarte sent three emails to Leete inquiring about the transfer.  *See* Wells Decl., Ex. 7-

23   CC.  The certified translation of the three emails, which were sent at 11:29 a.m., 12:39 p.m. and

24   12:50 p.m., respectively, are as follows:

25           good morning.  What is going on that there is no money, sorry, but I
             don't like this.  Please respond to me immediately and let me know
26           what is happening.  Thank you.

27           Good afternoon.  I am so embarrassed.  Please forgive me, but the
             money was just not showing up.  Thank you.  But now I need to
28           know who delivered it to be able to claim it.  Please, give me the

8

name of the person who sent the money.  I ask you with all my heart to please send me the name quickly.  Thank you.  God bless you.  Sorry again.

loren, forgive me but they have let me use the computer until 2 pm and I need to know the name of the person who wired the money.  Please collaborate with me.  It is urgent.  Thank you.

Wells Decl., Ex. 7-CC.

On November 28, 2011, there was another wire transfer in the amount of $2,804 from the same Conrad & Scherer account to the same bank in Colombia for the benefit of another person: Celina Lombardi Nieves.  *See* Wells Decl., Ex. 7-EE.  Drummond believes this additional payment was also for the benefit of Duarte, and therefore argues that the total payment for Duarte's benefit for which evidence is currently available is $7,084.

**F.     "Halcon" & Jose Joaquin Pinzon Diaquiz**

Defendants state that a confidential informant who goes by the pseudo name "Halcon" is the holder of the halcon85@yahoo.com account, and that Halcon's contact, Jose Joaquin Pinzon Diaquiz,[1] is the holder of the jojopidi@yahoo.com account.  In response to Drummond's second request for interrogatories in the *Balcero* case, Defendants listed Halcon as a witness who "has responsive facts" regarding connection between the AUC and Drummond.  Wells Decl. Ex. 13-MM at 4-5 (Response to Interrog. No. 1).  Defendants noted in their response to the interrogatory that Halcon's "real name [was] not known at this time[.]"  *Id*. at 5.  Defendants state that neither Halcon nor Pinzon Diaquiz provided testimony for the plaintiffs in the *Balcero* case.

There is evidence that a substantial amount of money was provided by Defendants to Halcon via Pinzon Diaquiz.  On April 8, 2008, a legal secretary from International Rights Advocates sent an email to jojopidi@yahoo.com.  Wells Decl. Ex. 7-FF.  The secretary introduced herself as "hav[ing] just started working with Rebecca L. Pentleton" at International Rights Advocates, and further wrote: "I just wanted to let you know that we have just sent you a transfer regarding our gentlemen.  You can pick it up at Moneygram and I am including here the information that you will need."  *Id*.  The amount that would be sent was 401673.15 COP, *see id.*,

---

[1] In the reply brief, Defendants state that "Jose Joaquin Perez … [is] presumably the owner of jojopidi@yahoo.com[.]"  Reply at 11.

United States District Court
Northern District of California

1   which today, converts to approximately $213.29.

2       There is a series of emails sent between Rebecca Pendleton of International Rights

3   Advocates and jojopidi@yahoo.com, as well as halcon85@yahoo.com.  On October 16, 2008,

4   Pendleton wrote to jojopidi@yahoo.com and carbon copied halcon85@yahoo.com:

5           We already spoke to Dan and he will give us money to cover the
            expenses for this month so that you have time to determine what you
6           will do.  Please let me know what your plan will be so that we may
            possibly help you.  We will be sending the wire today or tomorrow
7           using the same method as always.  I will write to you later with all
            of the information.
8
    Wells Decl., Ex. 7-GG.  On November 17, 2008, halcon85@yahoo.com wrote to Pendleton:
9
10          Ms. Rebeca, I apologize but we need you to do us a favor and help
            us out.  Ms. Marlene is asking for the money for the services
            because she says you had agreed that it would be on the 15th of
11          every month and today is the 17th.  Please forgive us for bothering
            so much.  Thank you.
12
    *Id*.  Later that day, Pendleton responded to the email from halcon85@yahoo.com:
13
14          It is no bother at all.  Look, the situation is like this.  The money will
            be late this month because it is coming from another source, but it
15          WILL arrive this month for sure.  I only ask that you be patient.  I
            know it is difficult, but I appreciate it very much.
16
            Thank you,
17
            Rebecca
18
    *Id*.

19      Also in the record are receipts of wire transfers in the amount of $1,250 sent every month

20  to Pinzon Diazquiz.  Wells Decl. Ex. 7-HH.  Drummond contends the payments total $50,000.

21  Well Decl. Ex. 7 (July 1, 2013 Declaration of H. Thomas Wells, III) ¶ 11.  The payments were

22  made by certain individuals who Drummond researched and purportedly confirmed either work or

23  used to work for Conrad & Scherer LLP.  *Id*.

24      **G.      Prior Discovery Requests**

25      In the Motions to Quash, Defendants and Leete argue that "[i]t is clear that Drummond is

26  aware of these email account holders, as Defendants provided communications with each

27  individual through the discovery process in the *Balcero* case."  Motion at 6.  Defendants provide

28  no evidence in support of this contention.  Defendants submit Drummond's requests for

United States District Court
Northern District of California

10

1  production of documents relating to Halcon, Pinzon Diaquiz and Duarte, but do not submit any

2  response showing that they actually produced any documents.  *See* Collingsworth Decl. Exs. 5-6.

3    **H.    Judge Proctor's Order on the Parties' Motions to Compel**

4      Both parties filed a motion to compel in the underlying libel case.  Judge Proctor discussed

5  the discovery issues with the parties−which mostly pertained to attorney-client privilege and work

6  product−in a hearing held on October 10, 2013.  *See* Declaration of H. Thomas Wells, III, Ex. 14

7  (Transcript of October 10, 2013 Discovery Hearing).  Prior to the hearing, Judge Proctor required

8  Defendants to include in their privilege log any documents they withhold for *in camera* review by

9  a magistrate.  The obligation to include any withheld documents in their privilege log continues

10  today.

11      Judge Proctor filed an order relating to the parties' motions to compel on October 15,

12  2013.  Wells Decl., Ex. 15.  In the order, Judge Proctor addressed the issue of payments to

13  witnesses as follows:

14      Interrogatories and requests for production on payments to witnesses
       are not overbroad and are properly within the scope of discovery.
15      The fact of payments to witnesses are not subject to work product
       objections.  Interrogatories and requests for production on research
16      regarding payments to witnesses are not overbroad and are properly
       within the scope of discovery.  For any documents (payments to
17      witnesses or research regarding payments to witnesses) withheld on
       grounds of attorney client privilege or work product, the Magistrate
18      Judge will examine the privilege log and related documents and will
       make independent findings for each issue remaining in dispute.

19

20  *Id.* at 3-4.

21    **I.    Motions to Quash**

22      In the Motions to Quash, Defendants and Leete contend the subpoenas should be quashed

23  for several reasons, a few of which have been withdrawn.[2]  Several issues still remain.  As a

24  _____

25      [2] For instance, in the opening briefs, Defendants and Leete argued that the subpoenas must
   be quashed because they were not issued from the district where the documents were to be
26  produced.  Drummond has since issued revised subpoenas changing the place of production form
   Alabama to the offices of Google and Yahoo!, which are located in this district.  In light of
27  Drummond's revised subpoenas, Defendants no longer contend that this is a basis to quash the
   subpoenas.  *See* Wells Decl. Ex. 6 (email between counsel for Defendants and Drumond).
28      In addition, Defendants and Leete argued that the subpoenas are vague, and therefore, may
   be construed to seek the content or subject line of emails, which would be protected by attorney-

11

United States District Court
Northern District of California

United States District Court
Northern District of California

1   threshold matter, Defendants and Leete contend they have standing to move to quash the

2   subpoenas as they relate to all four email addresses, as subpoenas seek protected work product and

3   violate the First Amendment rights of the email account holders.   Motion at 11.  In the reply

4   briefs, Defendants and Leete argue that they have standing to move to quash the subpoenas

5   because of the close relationship between Defendants/Leete and the three other email account

6   holders.

7          Defendants and Leete also contend that the subpoena to Google, as it relates to Leete's

8   email account, improperly seeks information protected by work product.  Reply at 5-6.

9   Defendants and Leete argue that work product includes factual information if it is arranged in a

10  way that reveals litigation strategy.  They contend that the subpoena directed to Leete's IP log-ins

11  over a ten-year period will reveal detailed information about "who she met with and corresponded

12  with at what time and from what locations…."  Reply at 6.  In response to Drummond's argument

13  that any claim to privilege or work product has been waived because of improper payments to

14  witnesses, Defendants and Leete argue that the payments are not improper, as they relate to the

15  security of the witnesses, and in any event, a court must first determine that the payments were

16  actually improper—which has not happened—prior to determining that privilege or work product

17  has been waived.

18         Defendants and Leete further contend that the information sought in the subpoena violates

19  the First Amendment rights of all email account holders.  In response to Drummond's contention

20  that the three email account holders who are not U.S. citizens have no First Amendment rights,

21  Defendants and Leete contend that the email account holders have a connection to this country on

22  account of their involvement in the underlying human rights litigation, and therefore, have rights

23  under the First Amendment.  Defendants and Leete present two arguments relating to First

24  Amendment rights.

25         First, Defendants and Leete argue that the email account holders' freedom of association

26

27  _____

28  client privilege.  In the reply brief, however, Defendants withdraw their objection based on
    attorney-client privilege because Drummond clarified in the opposition brief that it does not seek
    the content of any emails.  Reply at 5 n. 8.

will be chilled.  In particular, they argue that "Leete and the other email account holders have a protected right … to associate with others engaged [in] human rights litigation against Drummond, and more broadly to associate with human rights defenders and activists, all of which are highly protected political speech."  Motion at 13.  According to Defendants, Leete has established a *prima facie* case of First Amendment infringement by submitting a declaration which shows that "she will have to change the manner in which she communicates with colleagues, clients, and witnesses, including guarding where and when she logs into her email account."  *Id.*

Second, Defendants and Leete contend that the email account holders have a right to anonymity.  They argue that Drummond should not be entitled to identifying information of nonparties prior to establishing that these nonparties have engaged in any misconduct.  Defendants contend that these email account holders have unique privacy interests to not disclose their mailing addresses and phone numbers given the risks of retaliation they face in Colombia, and that "Halcon" has remained anonymous precisely because he fears retaliation from Drummond.

Finally, Defendants and Leete contend that the subpoenas should also be quashed because they are over-broad, duplicative of discovery already produced, and threaten the security of the email account holders.  Defendants contend that Drummond's subpoenas are overbroad because the request for documents starting in 2003 is arbitrary, as Leete did not join Defendants' litigation team until 2010, Duarte did not provide a declaration in the *Balcero* case until 2011, and the three letters which are the subject of the libel suit were not written until 2011.  Defendants contend that any email usage data after these letters were sent is irrelevant to the Defendants' state of mind at the time the letters were written.

Moreover, Defendants contend that the subpoenas seek duplicative information already produced in the *Balcero* case or has been requested in the underlying libel suit.  Defendants argue that they "have already produced responsive documents regarding communication between Defendants legal team (including Leete) and any potential witnesses in the *Balcero* litigation, including Halcon and Duarte."  Motion at 18.

Finally, permeating through Defendants' and Leete's briefs is the concern for the security of the email account holders, in particular, the holders of libardoduart@gmail.com,

1   jojopidi@yahoo.com, and halcon85@yahoo.com.  Defendants believe that if the identities, phone

2   numbers, mailing addresses, and IP address and log information of these three email addresses are

3   revealed, the email account holders' lives will be threatened.

4          In addition to submitting statements from Duarte attesting to threats he and his family have

5   received, Defendants have submitted reports regarding country conditions in Colombia, and in

6   particular, with regard to the risks faced by Colombians involved in human rights advocacy.

7   According to the U.S. Department of State, a non-governmental organization based in Colombia

8   reported that "29 human rights activists were killed and 81 threatened during the first half of the

9   [2012] year."  Smith Decl. Ex. 3 (U.S. Department of State, *Country Reports on Human Rights for*

10  *2012* (2013) at 39); *see also* Smith Decl. Ex. 4 (Human Rights Watch, *Paramilitaries' Heirs: The*

11  *New Face of Violence in Colombia* (2010) at 99).

12         Defendants also submit documents which show that Drummond has not been excluded

13  from recent accusations of human rights abuses.  Human Rights Watch published a report on

14  internal displacement of persons in Colombia which specifically references individuals who have

15  received threats in the past few years after trying to claim land they contend was wrongfully seized

16  and occupied by Drummond.  Smith Decl. Ex. 5 (Human Rights Watch, *The Risk of Returning*

17  *Home: Violence and Threats against Displaced People Reclaiming Land in Colombia* (2013) at

18  146).  Moreover, a former employee and union member of Drummond has submitted a declaration

19  in this action.  Declaration of Anibal Jose Perez Parra in Support of Defendants' and Leete's

20  Reply in Support of Motion to Quash Subpoenas.  Perez Parra states that he revealed photos of

21  Drummond dumping coal in January of 2013, and has received threats to himself and his family

22  ever since that he attributes to his denouncing of Drummond.  *See id.*

23  **III.    LEGAL STANDARD**

24         Federal Rule of Civil Procedure 45 governs discovery of nonparties by subpoena.  The

25  scope of the discovery that can be requested through a subpoena under Rule 45 is the same as the

26  scope under Rule 26(b).  Fed. R. Civ. P. 45 Advisory Comm.'s Note (1970) ("[T]he scope of

27  discovery through a subpoena is the same as that applicable to Rule 34 and other discovery

28  rules.");  Fed.R.Civ.P. 34(a) ("A party may serve on any other party a request within the scope of

1    Rule 26(b).").  Unless otherwise limited by court order, Rule 26(b) allows a party to obtain

2    discovery concerning "any nonprivileged matter that is relevant to any party's claim or defense."

3    Fed.R.Civ.P. 26(b)(1).  This includes "the identity and location of persons who know of any

4    discoverable matter."  *Id*.  "Relevant information need not be admissible at the trial if the

5    discovery appears reasonably calculated to lead to the discovery of admissible evidence."  *Id*.

6         A court must protect a nonparty subject to a subpoena if a subpoena "requires disclosure of

7    privileged or other protected matter" or the subpoena "subjects a person to undue burden."

8    Fed.R.Civ.P. 45(c)(3).  "On a motion to quash a subpoena, the moving party has the burden of

9    persuasion under Rule 45(c)(3), but the party issuing the subpoena must demonstrate that the

10   discovery sought is relevant."  *Chevron Corp. v. Donziger*, 12-MC-80237 CRB (NC), 2013 WL

11   4536808, at *4 (N.D. Cal. Aug. 22, 2013) (citing *EON Corp. IP Holdings, LLC v. T–Mobile USA,*

12   *Inc.,* No. 12–80082 LHK (PSG), 2012 WL 1980361, at *1 (N.D. Cal. June 1, 2012)).

13        A court must also limit discovery if it is unreasonably duplicative, if it can be obtained

14   from a source that is more convenient or less burdensome, or if the burden of producing it

15   outweighs its likely benefit.  Fed.R.Civ.P. 26(b)(2)(C).  Moreover, upon motion from a party who

16   certifies that they have conferred in good faith with the opposing party, a court may also "issue an

17   order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or

18   expense[.]"  Fed.R.Civ.P. 26(c).

19   **IV.    DISCUSSION**

20        **A.    Whether the Subpoenas Seek Relevant Information**

21        The Court first considers whether Drummond has met its burden of showing that the

22   information sought by the subpoenas is relevant to its libel claim.  Drummond contends that

23   information regarding Defendants' payments to witnesses is relevant to show that Defendants

24   published a defamatory statement with actual malice, "that is, with knowledge that it was false or

25   with reckless disregard of whether it was false or not."  *New York Times Co. v. Sullivan*, 376 U.S.

26   254, 280 (1964) (holding that when defamation speaks to a matter of public concern, the plaintiff

27   must show actual malice.  Indeed, Judge Proctor has already held that "[i]nterrogatories and

28   requests for production on research regarding payment to witnesses are … properly within the

15

1    scope of discovery[,]" thus implicitly holding that payments to witnesses are relevant to the issue

2    of whether Defendants acted with malice.

3              Drummond also contends that each of the four email addresses listed in the subpoenas has,

4    at some point, discussed payments that Defendants provided to witnesses.  While Drummond does

5    not explain why the IP address and logs associated with the email addresses are relevant to its libel

6    claim, the Court finds that such information could "lead to the discovery of admissible evidence."

7    Fed.R.Civ.P. 26(b)(1).  Subpart (a) of the subpoenas seeks "all identifying information associated

8    with the email addresses" including account holders' names, mailing addresses, phone numbers,

9    billing information, date of account creation and account information.  Subpart (b) of the

10   subpoenas seeks usage information for the email addresses, including the IP logs and IP address

11   information.  By discovering this information, Drummond may be able to locate and interview the

12   account holders and ask them why Defendants gave them money.  Defendants may also be able to

13   identify the location of meetings where discussion of payments may have occurred.  Therefore, the

14   subpoenas meet Rule 26's minimal relevancy standards.

15         **B.        Whether the Subpoenas Seek Duplicative Information**

16             Defendants argue that the information sought by the subpoenas is duplicative of discovery

17   already produced.  The Court finds this argument without merit in light of Defendants' failure to

18   provide any evidence showing what discovery they have produced in previous litigation.

19   Defendants merely submit Drummond's requests for production of documents, and make no

20   showing that Defendants' responses to such requests have satisfied their discovery obligations.

21   *See* Collingsworth Decl. Exs. 5-6.

22                                       *        *        *

23             The remaining issues in this case are best addressed by separately considering the Google

24   subpoena as it relates to Leete's email address at lorrainemleete@gmail.com, and then considering

25   the Google and Yahoo! subpoenas as they relate to the libardoduart@gmail.com,

26   jojopidi@yahoo.com, and halcon85@yahoo.com accounts.  This is because most of the issues

27   raised in this case, including standing, work product, First Amendment rights, and potential

28   security risks upon disclosure of the information sought, require a distinct analysis for Leete given

United States District Court
Northern District of California

16

1    her unique status as a movant to quash the subpoenas, a lawyer involved in the *Balcero* litigation,

2    and an American citizen.

3            **C.      Lorrainemleete@gmail.com**

4            Defendants and Leete argue that the Google subpoena should be quashed as it relates to the

5    lorrainemleete@gmail.com account because it impermissibly seeks work product and will cause a

6    chilling effect on Leete's First Amendment rights.  The Court first discusses subpart (a), which

7    relates to identifying information, and next considers subpart (b) of the subpoena, which relates to

8    IP address and log information.

9            **1.      Whether Subpart (a) of the Google Subpoena as it relates to Leete's
                        Identifying Information Should be Quashed**
10

11           Subpart (a) of the subpoena requests all "identifying information associated with" the

12   lorrainemleete@gmail.com account, including the name, mailing address, phone number, billing

13   information, and account creation information of the account holder.  Defendants and Leete do not

14   articulate any specific challenge to disclosure of this information, and instead focus on the IP

15   address and log data.  While Defendants contend that Leete's identity is already known by

16   Drummond, and Leete believes that the subpoena is Drummond's attempt to intimidate her, *see*

17   Leete Declaration ¶ 6, this is not a sufficient basis to strike this portion of the subpoena.  Leete's

18   identity is known by Drummond, but the subpoena seeks further information, such as Leete's

19   mailing address and phone number, which is clearly discoverable.  *See* Fed.R.Civ.P. 26(b)(1)

20   (discoverable information includes "the identity and location of persons who know of any

21   discoverable matter.").  Indeed, Drummond has been unsuccessfully attempting to serve Leete

22   with a subpoena.  Moreover, unlike the other email account holders, Defendants and Leete have

23   not expressed any concern for Leete's safety if her mailing address is disclosed.

24           Accordingly, the Motions to Quash are denied with respect to the Google Subpoena as it

25   relates to the lorrrainmleete@gmail.com account and subpart (a) of the request for documents.

26   Having found that subpart (a) of the request for documents in the Google subpoena is

27   discoverable, the Court focuses the remaining analysis with respect to Leete on subpart (b), which

28   relates to the disclosure of IP address and log information.

1

2

**2.      Whether Subpart (b) of the Subpoena should be Quashed because it Seeks Work Product**

3      Defendants argue that the subpoena to Google as it relates to lorrainemleete@gmail.com

4   should be quashed on the basis that it seeks protected work product.  Defendants contend that

5   "revealing the location of each log-in to Leete's email account will track her geographical location

6   and movements every time she logged into her Gmail account, including which offices she has

7   worked out of and who she has met with at what time, over a ten-year period."  Reply at 5.

8   Defendants argue that "[w]hile the fact Leete was at a specific meeting at a specific location alone

9   may not constitute work product, work product can also include factual information if it revealed

10   in a way that will reveal litigation strategy by the way in which it is arranged."  *Id*. at 6.

11      The Court will not quash the subpoenas on the basis of work product.  The work product

12   doctrine protects "from discovery documents and tangible things prepared by a party or his

13   representative in anticipation of litigation."  *United States v. Richey*, 632 F.3d 559, 567 (9th Cir.

14   2011) (citing *Admiral Ins. Co. v. U.S. Dist. Ct*., 881 F.2d 1486, 1494 (9th Cir. 1989)).  The IP

15   addresses and logs are not "prepared" by Defendants or by Leete, but rather exist merely because

16   Leete chose to access her email, and because Google automatically keeps records of Leete's IP

17   log-in information.  While Defendants and Leete present an interesting theory, they provide no

18   authority for the proposition that IP log data may reveal a litigation strategy protected by work

19   product.

20      Moreover, Defendants and Leete offer no specifics in their analysis, and their broad theory

21   would prevent the disclosure of all IP log data, even that which has nothing to do with Leete's

22   preparation for litigation.  Judge Proctor has endeavored to avoid such broad claims of privilege

23   by appointing a magistrate to review Defendants' privilege log.  Judge Proctor has also

24   specifically held that "[f]or any documents (payments to witnesses or research regarding payments

25   to witnesses) withheld on grounds of attorney client privilege or work product, the Magistrate

26   Judge will examine the privilege log and related documents and will make independent findings

27   for each issue remaining in dispute."  Wells Decl., Ex. 15 (Judge Proctor's Order on Motions to

28   Compel).  Thus, quashing the subpoenas on the basis of work product would not only be

United States District Court
Northern District of California

18

1   unprecedented, it would create inconsistent rules regarding Defendants' assertions of privilege and

2   work product in the underlying libel suit.

3          Having found that the subpoena to Google does not impermissibly seek work product, the

4   Court need not address Defendants' argument that Defendants and Leete waived their claims to

5   privilege and work product by providing money to witnesses in Colombia.

6          **3.      Whether Subpart (b) of the Subpoena should be Quashed because it
7                  Seeks Information that Infringes Leete's First Amendment Rights**

8          Defendants and Leete also contend that the subpoena chills Leete's rights to freely

9   associate under the First Amendment as it relates to IP address and IP log information.  The First

10  Amendment provides, in relevant part, that "Congress shall make no law … abridging the freedom

11  of speech, or of the press; or the right of the people peaceably to assemble…." U.S. CONST. amend

12  I.  The Ninth Circuit has stated that "[t]he freedom to associate with others for the common

13  advancement of political beliefs and ideas lies at the heart of the First Amendment."  *Perry v.*

14  *Schwarzenegger*, 591 F.3d 1136, 1132 (9th Cir. 2009).  Indeed, "[e]ffective advocacy of both

15  public and private points of view, particularly controversial ones, is undeniably enhanced by group

16  association."  *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).  Therefore, "[w]here … discovery

17  would have the practical effect of discouraging the exercise of First Amendment associational

18  rights, the party seeking such discovery must demonstrate a need for the information sufficient to

19  outweigh the impact on those rights."  *Perry*, 591 F.3d at 1132.

20         In *Perry*, the Ninth Circuit articulated a two-part framework for analyzing claims of First

21  Amendment privilege in response to a discovery request:

22             The party asserting the privilege must demonstrate a prima facie
               showing of arguable first amendment infringement.  This *prima*
23             *facie* showing requires appellants to demonstrate that enforcement
               of the discovery requests will result in (1) harassment, membership
24             withdrawal, or discouragement of new members, or (2) other
               consequences which objectively suggest an impact on, or 'chilling'
25             of, the members' associational rights.

26             If appellants can make the necessary *prima facie* showing, the
27             evidentiary burden will then shift to the government to demonstrate
               that the information sought through the discovery is rationally
28             related to a compelling governmental interest and the least

United States District Court
Northern District of California

> restrictive means of obtaining the desired information.  More
> specifically, the second step of the analysis is meant to make
> discovery that impacts First Amendment associational rights
> available only after careful consideration of the need for such
> discovery, but not necessarily to preclude it.

*Perry*, 591 F.3d at 1140 (citations, quotations and alterations omitted).  In the discovery context, the question is "whether the party seeking discovery has demonstrated an interest in obtaining the disclosures it seeks which is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of association." *Id*. (quotations and alterations omitted).  This is a balancing test that several factors into account, such as "the importance of the litigation," "the centrality of the information sought to the issues in the case," "the existence of less intrusive means of obtaining the information," "and the substantiality of the First Amendment interests at stake[.]" *Id*. at 1140-41.

Moreover, "the party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation−a more demanding standard of relevance than under Federal Rule of Civil Procedure 26(b)(1)." *Id*. at 1141.  Plaintiffs in *Perry*−same sex couples who opposed Proposition 8−sought internal campaign communications concerning the strategy of Prop 8 proponents. *Id*. at 1132.  The Ninth Circuit believed the plaintiffs' discovery request was "reasonably calculated to lead to the discovery of admissible evidence on the issues of voter intent and the existence of a legitimate state interests" with respect to their equal protection claim. *Id*. at 1144.  Nevertheless, the court held that the "Rule 26 standard … fails to give sufficient weight to the First Amendment interests at stake." *Id*.  Because the Proposition 8 proponents established a *prima facie* case of First Amendment infringement by showing that disclosure of internal strategy documents would discourage participation in campaign initiatives and mute the exchange of ideas, the court applied "the First Amendment's more demanding heightened relevance standard." *Id*.  Finding that the information sought through discovery was "attenuated from the issue of voter intent," and that the plaintiffs could "obtain much of the information they seek from other sources," the Ninth Circuit held that the plaintiffs had not demonstrated a sufficient interest to justify the chilling effect on First Amendment rights. *Id*. at 1144-45.

20

The Court finds that Leete has demonstrated a *prima facie* case of First Amendment privilege in the discovery sought by Defendants.  In her declaration, Leete writes that she is based in Colombia, where she regularly associates with human rights activists, union organizers, and other individuals involved in litigation against Drummond.  Leete Decl. ¶¶ 3, 7.  Leete believes the Colombian individuals with whom she meets are at risk of "persecution and assassination for their organizing efforts." *Id.* ¶ 7.  Leete's belief is corroborated by the human rights reports submitted by Defendants, including the U.S. Department of State's human rights report for 2012, which cites other reports documenting a high number of threats against and assassinations of human rights advocates.  *See* Smith Decl. Ex. 3 (U.S. Department of State, *Country Reports on Human Rights for 2012* (2013) at 39).  Leete writes that during her meetings with these individuals, she has logged into her email, and therefore believes that "disclosure of [her] IP logs could disclose the location of threatened union leaders and human rights defenders, which unnecessarily subjects them to danger." *Id.* ¶ 7.  The potential disclosure of IP log data has already altered the way Leete meets with these individuals and uses her email account.  Leete states that she can no longer log in to her email account during meetings with human rights defenders and union organizers for fear that she will disclose their locations, and put them at greater risk. *Id.* ¶ 9.

Drummond argues that there is no First Amendment infringement because Defendants have failed to show that Leete was engaged in "expressive association" with a "group organized to engage in speech." Opp. at 13.  The Court disagrees.  In support of their argument, Defendants cite *City of Dallas v. Stranglin*, 490 U.S. 19 (1989), where the Supreme Court held that the State of Texas did not infringe any First Amendment associational rights by passing a law that prohibited adults from entering teenage dance halls. *Id.* at 25.  This case is easily distinguished from *City of Dallas*, however, because unlike the dance-goers in *City of Dallas*, Leete does not claim a right to merely associate with other individuals for a non-expressive purpose such as social dancing.  Rather, she claims a right to associate with other individuals so they may collectively further their common goal of promoting human rights in Colombia by holding human rights abusers accountable. *Perry*, 591 F.3d at 1132 ("The freedom to associate with others for the common advancement of political beliefs and ideas lies at the heart of the First Amendment.").

United States District Court
Northern District of California

The focus of the expressive association inquiry is whether individuals associate to engage "in some form of expression, whether it be public or private." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  In this case, it is clear that Leete is a member of a transnational group that engages in expressive activity through its advocacy for human rights in Colombia.

Drummond further argues that there is no First Amendment infringement because Leete does not engage in any speech or associational activity simply by logging into her email account. Technically, Drummond is correct−Leete engages in no express activity by logging into her email. But the disclosure of IP log data does not merely disclose the fact that Leete logged into her email; it discloses the date and time Leete logged into her email account as well as how long Leete was logged in. *Donzinger*, 2013 WL 3228753, at *2.  More importantly, Disclosure of the IP addresses will enable Drummond to discover where Leete logged in to her email by simply entering the IP address into a free website. *Id*.  When Drummond discovers the various locations where Leete logged in to her email account, Drummond will be able to make reasonable inferences regarding the individuals and organizations with whom Leete has associated with.  It is well-established that "[t]he compelled disclosure of political associations can have … a chilling effect" on one's right to freely associate. *Perry*, 591 F.3d at 1139.  The Supreme Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S. Ct. 612, 656, 46 L. Ed. 2d 659 (1976) (citations omitted).  While the subpoena does not technically seek a list of individuals with whom Leete has associated with in Colombia, it certainly seeks information that will enable Drummond to discover just that.

Moreover, in holding that Leete has established a *prima facie* case of First Amendment infringement, the Court finds that Leete enjoyed First Amendment rights abroad.  Neither the Supreme Court nor the Ninth Circuit has explicitly held that First Amendment protections accorded to United States citizens apply extraterritorially. *See Haig v. Agee*, 453 U.S. 280, 308, 101 S. Ct. 2766, 2783, 69 L. Ed. 2d 640 (1981) (finding that an American citizen had no First Amendment right to retain his passport after engaging in conduct which threatened the security of the United States while "[a]ssuming, *arguendo*, that First Amendment protections reach beyond

22

our national boundaries…."); *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433

F.3d 1199, 1217 (9th Cir. 2006) (noting that "[t]he extent of First Amendment protection of

speech accessible solely by those outside the United States is a difficult and, to some degree,

unresolved issue."); *see also Laker Airways Ltd. v. Pan Am. World Airways, Inc.*, 604 F. Supp.

280, 287 (D.D.C. 1984) ("It is less clear… whether even American citizens are protected

specifically by the First Amendment with respect to their activities abroad").  The Supreme Court

has held, however, that the Bill of Rights, which includes the First Amendment, applies to protect

United States citizens even when they are abroad:

> [W]e reject the idea that when the United States acts against citizens
> abroad it can do so free of the Bill of Rights.  The United States is
> entirely a creature of the Constitution.  Its power and authority have
> no other source.  It can only act in accordance with all the
> limitations imposed by the Constitution.  When the Government
> reaches out to punish a citizen who is abroad, the shield which the
> Bill of Rights and other parts of the Constitution provide to protect
> his life and liberty should not be stripped away just because he
> happens to be in another land.

*Reid v. Covert*, 354 U.S. 1, 5-6, 77 S. Ct. 1222, 1225, 1 L. Ed. 2d 1148 (1957).

The few district courts that have addressed this issue of extraterritorial application of the

First Amendment disagree as to the extent such protections should apply abroad.  For instance, in

*DeRoburt v. Gannett Co., Inc.*, the court held that the First Amendment−specifically, the First

Amendment's intersection with defamation law−must apply when a public figure accuses a United

States citizen of publishing defamatory material abroad.  83 F.R.D. 574, 580 (D. Haw. 1979) ("It

is the policy of the forum state and Guam that critics of public officials and public figures receive

the protection afforded by the First Amendment.  The importance of this policy cannot be

overstated.").  In an analogous case, however, another district court disagreed with the reasoning

in *DeRoburt* and applied a more nuanced analysis which took several factors into account,

including the foreign nation's "interest in compensating its own citizens for harm to their

reputation from defamatory falsehoods."  *Desai v. Hersh*, 719 F. Supp. 670, 676 (N.D. Ill. 1989).

In *Bullfrog Films, Inc. v. Wick*, when considering whether federal regulations relating to the

content of videos infringed on film makers' speech rights abroad, the court held that "there can be

23

no question that, in the absence of some overriding governmental interest such as national security, the First Amendment protects communications with foreign audiences to the same extent as communications within our borders." 646 F. Supp. 492, 502 (C.D. Cal. 1986) *aff'd*, 847 F.2d 502 (9th Cir. 1988).

The foregoing cases consistently adhere to one common theme−at the very least, a United States citizen's First Amendment rights should be recognized abroad in the absence of competing considerations.  In *Bullfrog*, the court took this rule one step further, and found that First Amendment protections apply equally abroad so long as one type of competing interest−the security of the United States−is not at stake.  *Bullfrog*, 646 F. Suppl at 502.  In *Desai*, the court only limited a citizen's First Amendment speech rights abroad in respect of a foreign country's defamation law.  *Desai*, 719 F.Supp. at 676.  The Court can think of no competing consideration in this case, much less a competing consideration that would justify stripping Leete of her First Amendment associational rights "just because [s]he happens to be in another land."  *Reid*, 354 U.S. at 6.  Moreover, while Leete's associational activity occurred *outside* the United States, she alleges infringement of her First Amendment rights *inside* the United States, as the subpoenas require production of the IP logs in California.  Furthermore, Leete's associational activity did not occur entirely in Colombia, but rather includes transnational communications via email with her colleagues in the United States in addition to Leete's meetings in Colombia.

Having found that Leete established a prima facie case of First Amendment infringement of her right to freely associate, the burden shifts to Drummond to demonstrate "an interest in obtaining the disclosure it seeks which is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of association."  *Perry*, 591 F.3d at 1140. Drummond must show that the IP address and log information sought in the subpoena is "highly relevant" to the libel claim, as well as "carefully tailored" to avoid unnecessary interference with protected activities.  *Id.* at 1141.  It is insufficient for Drummond to claim that the information sought will lead to the discovery of admissible evidence, as the "Rule 26 standard … fails to give sufficient weight to the First Amendment interests at stake."  *Id.* at 1144.

United States District Court
Northern District of California

1    Drummond has not shown that the information sought by the subpoenas is "highly

2    relevant" to the libel claim or "carefully tailored."   While discovery of Leete's IP address and log

3    data could lead to the discovery of admissible evidence, it is not, in itself, relevant to the libel

4    claim because it does not have "any tendency to make a fact [that is of consequence] more or less

5    probable that it would be without the evidence." Fed.R.Evid. 401.  Defendants do not dispute the

6    fact the payments were made; the issue is whether Defendants made the payments to provide

7    security to the witnesses or to bribe the witnesses to provide evidence against Drummond.  That

8    information cannot come from the location of Leete's log-ins.  It might come from

9    contemporaneous documents on the payments and the recollection of the witnesses involved.  A

10   sweeping demand for all log-ins over a period of time is certainly not "carefully tailored" to find

11   such evidence while avoiding interference with Leete's First Amendment rights.  For these

12   reasons, Drummond has not met its burden of justifying the infringement on Leete's First

13   Amendment rights.  *Perry*, 591 F.3d at 1140.

14           Accordingly, the Motions to Quash are granted with respect to the Google Subpoena as it

15   relates to the lorrrainmleete@gmail.com account and subpart (b) of the request for documents.

16       **D.     Libardoduart@gmail.com, Jojopidi@yahoo.com and Halcon85@yahoo.com**

17           In the Motions to Quash, Defendants and Leete argue that the subpoenas must be quashed

18   as they relate to the libardoduart@gmail.com, jojopidi@yahoo.com and halcon85@yahoo.com

19   accounts because disclosure of the information sought will infringe the email account holders'

20   First Amendment rights, because the information requested is overbroad, and because the email

21   account holders' security will be put at risk if their IP address and log data is disclosed.

22   Drummond challenges each of these arguments, and further contends that Defendants and Leete

23   have no standing to challenge the subpoenas as they relate to these addresses.

24       **1.      Whether Defendants have Third-Party Standing to Protect First
                   Amendment Rights of the Email Account Holders**

25

26           The general rule is that "a party has no standing to seek to quash a subpoena issued to

27   someone who is not a party to the action, unless the objecting party claims some *personal right or*

28   *privilege* with regard to the documents sought."  9A Charles A. Wright & Arthur R. Miller,

1   Federal Practice and Procedure § 2459 (3d ed. 2008) (emphasis added); *Knoll, Inc. v. Moderno,*

2   *Inc.*, No. 12-mc-80193 SI, 2012 WL 4466543, at *2 (N.D. Cal. Sept. 26, 2012) ("[A] party

3   moving to quash a non-party subpoena has standing when the party has a personal right or

4   privilege in the information sought to be disclosed."); *Chevron Corp. v. Donziger*, No. 12-mc-

5   80237 CRB (NC), 2013 WL 4536808, at *4 (N.D. Cal. Aug. 22, 2013) (same); *Am. Broadcasting*

6   *Cos. Inc. v. Aereo, Inc.*, No. 12-mc-80300 RMW (PSG), 2013 WL 1508894, at *2 (N.D. Cal. Apr.

7   10, 2013) (same).  A party does not, however, "have standing to quash a subpoena on the basis

8   that the non-party recipient of the subpoena would be subjected to an undue burden when the non-

9   party has failed to object."  *Kremen v. Cohen*, No. 11-05411 LHK (HRL), 2012 WL 2277857, at

10   *3 (N.D. Cal. June 18, 2012) (quoting *Finley v. Pulcrano*, 2008 WL 4500862 PVT, at *4 (N.D.

11   Cal. Oct. 6, 2008)).

12          The initial question is whether Defendants have asserted a personal right or privilege in the

13   information sought by the subpoenas.  The Court already found that the subpoena does not seek

14   work product as it relates to Leete's email address, and has little difficultly concluding the same

15   for the other email addresses, which are *not* held by an attorney preparing for litigation.  Thus, it

16   follows that Defendants do not assert any personal right or privilege to the information sought by

17   the subpoenas as they relate to these three email addresses.  Nevertheless, Defendants argue they

18   have third party standing to move to quash the subpoenas as they relate to these email addresses

19   on the basis of (1) their relationship with the email account holders and (2) the infringement of the

20   email account holders' First Amendment rights.  For the following reasons, the Court disagrees.

21          The parties agree that an individual has third party standing to assert another's right if "'the

22   party asserting the right has a close relationship with the person who possesses the right,' and

23   where 'there is a hindrance to the possessor's ability to protect his own interests.' "  *Donziger*,

24   2013 WL 4536808, at *5 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)).  The parties, of

25   course, disagree regarding whether Defendants have shown that they have a close relationship

26   with the email account holders, as well as whether the email account holders are unable to protect

27   their own rights.

28

United States District Court
Northern District of California

26

1  Defendants and Leete argue that they have a close relationship with the email account

2  holders by virtue of their past common involvement in the litigation against Drummond. They

3  further contend that the email account holders may not be able to protect their own interests

4  because they "likely" do not speak English, are located in Colombia, and Duarte, at least, is

5  currently detained in a Colombian prison. The Court finds, however, that the moving parties do

6  not have a "close relationship" to the email account holders. The holders are, at best, witnesses in

7  the underlying case and in the *Balcero* case. This is insufficient. Accordingly, the moving parties

8  do not have standing to move to quash the subpoenas as they relate to these three email addresses.

9  In any event, these three email account holders have no First Amendment rights. The

10  Supreme Court has held that the First Amendment's reference to "the people" means the right

11  belongs to "a class of person who are part of a national community or who have otherwise

12  developed sufficient connection with this country to be considered part of that community."

13  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *see also DKT Memorial Fund Ltd.*

14  *v. Agency for Int'l Dev.*, 887 F.2d 275, 283 (D.C. Cir. 1989) (affirming district court's

15  determination "that the interests in free speech and freedom of association of foreign nationals

16  acting outside the borders, jurisdiction, and control of the United States do not fall within the

17  interests protected by the First Amendment."). In their reply brief, Defendants argue that the three

18  non-citizen email account holders "are also protected by the First Amendment because they have

19  'sufficient connection with this country to be considered part of that community,' since each

20  individual is being targeted precisely because of their connection to the underlying human rights

21  litigation brought in U.S. court." Reply at 10 (quoting *Verdugo-Urquidez*, 494 U.S. at 265).

22  Defendants do not offer any further elaboration, nor do they cite any authority for the proposition

23  that one's connection with a lawsuit in the United States is a "sufficient connection with this

24  country to be considered part of that community…." *Id.*

25  After the Supreme Court's decision in *Verdugo-Urquidez*, the Ninth Circuit wrote: "Not

26  until an alien has assumed the complete range of obligations that we impose on the citizenry may

27  he be considered one of 'the people of the United States' entitled to the full panoply of rights

28  guaranteed by our Constitution." *United States v. Barona*, 56 F.3d 1087, 1093-94 (9th Cir. 1995)

27

United States District Court
Northern District of California

1   (internal quotations omitted); *see also Mendez de Leon v. Reno*, No. 97-2482 CW, 1998 WL

2   289321, at *5 (N.D. Cal. Mar. 26, 1998) (residing in San Francisco for four years was sufficient

3   for an illegal alien to become part of "the people").  Defendants have not explained how the email

4   account holders' participation in the *Balcero* lawsuit could have possibly required them to

5   "assume[] the complete range of obligations" imposed on United States citizens.  *Id*.  Indeed, in

6   *Donziger*, Judge Kaplan of the Northern District of New York considered First Amendment

7   objections to substantively identical subpoenas issued to Microsoft, and held that there was no

8   evidence the owners of the email addresses affected by the subpoenas were United States citizens

9   or otherwise entitled to protection under the First Amendment.  *Donziger*, 2013 WL 3228753, at

10   *4.

11        Accordingly, the Court finds that Defendants do not have third-party standing to protect

12   rights of the three email account holders, and further holds the email account holders, with the

13   exception of Leete, have no First Amendment rights.

### 2.        Whether the Subpoenas Must be Modified

15        While Defendants do not have standing to move to quash the subpoenas and the holders of

16   the email addresses libardoduart@gmail.com, jojopidi@yahoo.com and halcon85@yahoo.com do

17   not have First Amendment rights, that does not end the inquiry.  The Court has an independent

18   obligation "to avoid imposing undue burden or expense on a person subject to the subpoena."

19   Fed.R.Civ.P. 45(c)(1); *Donziger*, *supra*, 2013 WL 4536808, at *11.  Only relevant evidence is

20   discoverable, and the Court must limit the extent of discovery sought if the burden outweighs the

21   likely benefit.  Fed.R.Civ.P. 26(b)(2)(C).

22        First, the Court finds that the subpoenas are overbroad as to time.  The subpoenas request

23   documents relating to IP address and log information from 2003 to the present.  The allegedly

24   defamatory letters were sent during 2011.  The information provided to the Court indicates only

25   that Duarte received payments during 2011.  Other information indicates that in 2008, the holder

26   of halcon85@yahoo.com was receiving payments with the help of the holder of

27   jojopidi@yahoo.com.  Identity information of IP addresses long before the first payments, or after

28   the allegedly defamatory letters were sent, are of minimal relevance.  Accordingly, subpart (b) of

28

the Google subpoena as it relates to the libardoduart@gmail.com account is therefore limited to the period of July 1, 2010 to September 19, 2011, the date of the last allegedly defamatory letter. Subpart (b) of the Yahoo! subpoena is limited to the period of January 1, 2008 to September 19, 2011.

Moreover, Defendants are entitled to a protective order prohibiting Drummond's counsel from sharing information disclosed by the Google and Yahoo! subpoenas as it relates to both the identifying information in subpart (a) and the IP address and log information in subpart (b).   The Court reaches this conclusion because Defendants have made a sufficient showing that disclosure of the identifying and usage information to the libardoduart@gmail.com, jojopidi@yahoo.com and halcon85@yahoo.com accounts beyond counsel may pose a safety risk to the holders of the email accounts and/or their families.

Accordingly, the Court finds that there is sufficient evidence in the record to justify a protective order regarding the information and documents produced by Google and Yahoo!. Specifically, all information and documents produced pursuant to the subpoenas shall not be disclosed, directly or indirectly, to anyone other than outside counsel of record, and their employees, for parties in the underlying libel action in Alabama.  The parties shall meet and confer regarding any modification of this restriction which would allow other individuals to be privy to this information.  This protective order covers the specific information disclosed by Google and Yahoo! in response to the subpoenas, as well as any additional information that may be gathered by using the specific information disclosed by Google and Yahoo!, including but not limited to the locations associated with IP addresses and log-ins.

## V.    CONCLUSION

For the foregoing reasons, the Motions to Quash are GRANTED in part and DENIED in part.

**IT IS SO ORDERED**.

Dated: November 18, 2013

_____
JOSEPH C. SPERO
United States Magistrate Judge

29